OCONUS DOD EMPLOYEE RO-
TATION ACTION GROUP,
et al., Plaintiffs,

v.

William S. COHEN, Secretary,
Department of Defense,
Defendant.

CIV.A. No. 99–118 GK.

United States District Court,
District of Columbia.

March 29, 2000.

Walter George Birkel, Tighe, Patton & Babbin, P.L.L.P.C., Washington, DC.

Benjamin M. Lawsky, U.S. Department of Justice, Washington, DC.

Melissa Hart, U.S. Department of Justice, Federal Programs Branch, Washington, DC.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs ask the Court to invalidate "Draft Subchapter 1230," which they claim was implemented to limit to five years the amount of time civilian employees may serve overseas. The organizational Plaintiff, OCONUS DOD Employee Rotation Action Group, (also known as "Outside Continental United States Department of Defense Employee Rotation Action Group"), is an unincorporated association of approximately 125 career civil servants assigned to overseas positions, primarily in Europe, with the Department of Defense ("DOD"). The two named individual Plaintiffs, Daniel Gasparino and Edward Vierheller, are members of ODERAG.

Plaintiffs allege that prior to implementation of Draft Subchapter 1230, they could obtain unlimited extensions of time beyond five years and thus continue working for DOD overseas indefinitely. Plaintiffs claim violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and 10 U.S.C. § 1586.[1] Plaintiffs also bring suit for breach of contract and for unconstitutional takings under the Fifth Amendment. This matter comes before the Court upon Defendant's Motion to Dismiss [# 7] for failure to state a claim and for lack of subject matter jurisdiction. Defendant's Motion to Dismiss is **granted in part and denied in part**.

## I. Background[2]

Civilians working for DOD can be assigned to work overseas for one tour of duty, usually lasting three years.[3] They have a "right to return" to their previous DOD jobs in the United States, at the same grade level and salary they had when they left, if they remain overseas less than five years. Civilian employees who meet certain criteria, including satisfactory job performance, have been able to receive extensions from DOD permitting them to remain overseas for more than one tour of duty. Plaintiffs claim that Draft Subchapter 1230, which they allege is invalid, has ended the practice of granting extensions and thus unfairly limited the amount of time they can work overseas.

Congress first addressed the issue of allowing civilians to work for the United States government overseas in 1960 when it passed 10 U.S.C. § 1586(b), which empowered the Secretary of Defense to

> establish and operate programs of rotation which provide for the granting of the right to return to a position in the United States to each civilian employee in the department concerned—(1) who, while serving under a career-conditional or career appointment in the competitive civil service, is assigned at the request of the department concerned to duty outside the United States...

Pursuant to this statute, on April 1, 1966, DOD administratively established the Five Year Rule ("the Rule"). *See* Civilian Personnel Manual ("CPM") 301.4–2a(1). The Rule limits civilian DOD employees to five years of continuous overseas service before they must return to the

---

1. Plaintiffs originally also invoked the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 2101 *et seq.*, but have conceded that there is no private right of action under that statute. Pls.' Opp'n at 27.

2. For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. *Shear v. National Rifle Ass'n of Am.*, 606 F.2d 1251, 1253 (D.C.Cir.1979). Therefore, the facts set forth herein are taken from Plaintiffs' Complaint.

3. A tour of duty is the length of time of the employee's original overseas assignment.

United States. Under the Rule, after five years of overseas service a civilian employee loses her right to return to her previous DOD position in the United States. As established in 1966, and as it exists today, the Rule allows supervisors to grant individuals extensions to continue working overseas beyond five years on a case-by-case basis. Even with an extension, however, a civilian employee loses her right to return if she works overseas for more than five years.

As part of the Rule, DOD required civilian employees to sign rotation agreements before working overseas, which the named Plaintiffs and most ODERAG members did.[4] The rotation agreements provide that if employees wish to continue working for DOD when they are transferred back to the United States, they must either exercise their right to return, if they still have it, or enroll in the Priority Placement Program ("PPP").

DOD created PPP in the 1970s to find new positions for civilian employees returning from overseas who had lost the right to return to their previous positions, and for employees whose grade had increased while they were overseas and who therefore chose not to return to their previous, lower grade positions. Under PPP, employees returning to the United States select a geographical area of the United States in which they want to work. If they do not receive an offer of DOD employment with the same seniority, status, and tenure (although not necessarily the same position) held prior to their overseas employment within that geographical area, they must expand the area in which they are willing to accept work. If they do not accept the first offer they receive, they are terminated from DOD employment. Thus a returning employee who has lost their right to return may have to choose to live far from where they wish, take a job they don't like, or be fired by DOD.

In 1981, DOD liberalized the Five Year Rule, and eliminated previous restrictions on the number of extensions a civilian employee could receive. However, the 1981 Rule, like the 1966 version, continued to revoke the right to return after a civilian employee had served overseas for five years. It provides as follows:

> At the request of management, extensions of the 5–year limitation of up to an additional tour of duty for the area may be granted by the DOD Component concerned on an individual-case basis for employees who are rated fully successful or better; are current in the knowledge, skills, and abilities required in their jobs; and have successfully adapted to the overseas work and cultural environment. *An unlimited number of additional extensions beyond 5 years, each up to an additional tour of duty for the area, may be granted* as long a[s] the employee continues to be rated fully successful or better, and management certifies that the employee is current in the knowledge, skills, and abilities required in his or her job.

CPM § 301.4–2a(4) (Emphasis and footnote added.) This language was readopted in August 1988, and DOD claims it is currently in effect. Def.'s Mem. at 2.

On March 26, 1997, DOD Assistant Secretary of Defense for Civilian Personnel Policy, Diane M. Disney, issued a memorandum seeking comments on Draft Subchapter 1230, which would replace CPM 301.4. Draft Subchapter 1230 would limit most civilian employees to one tour of duty, and in no case permit more than one extension for an employee covered by the

---

**4.** The rotation agreements differ slightly among DOD's various divisions.

subchapter.[5] *See* Draft DOD 14000.25–M.

Draft Subchapter 1230 has never been formally adopted as a final rule, although Plaintiffs allege that it has been informally adopted and is being implemented. For example, the U.S. Army in Europe ("USAREUR") is reducing both the number of its employees who have served overseas longer than five consecutive years, and the number of extensions it grants. *See* Compl. Exs. G–I. Other DOD sections in Europe now require all civilian employees to return to the United States after five years overseas. DOD and USAREUR have stated in vacancy announcements for civilian positions that those openings are not available to DOD employees who have served overseas for more than three continuous years.

The named Plaintiffs and some other members of ODERAG have, at their managers' request, accepted extensions, and as a result have worked overseas for more than five years. They have therefore lost their right to return to their previous positions in the United States, and claim that they will be forced to return to the United States at the end of their current extensions because of Draft Subchapter 1230. Plaintiffs claim that these employees were led to believe that the 1981 version of the Five Year Rule would not be changed to their detriment, and that they would continue to receive extensions of their tours of duty as long as they performed satisfactorily. They waived their right to return in the belief that they could remain overseas as long as they performed well.

Plaintiffs allege that Defendant has *sub silentio* implemented Draft Subchapter 1230, preventing them from receiving any further extensions and forcing them to return to the United States before they wanted to or would have been required to under the 1981 version of the Rule. They charge Defendant with adopting Draft Subchapter 1230 as a final rule without following the procedures required by the APA. They also claim that by denying them extensions, thereby forcing them to return to the United States, Defendant has breached his contract with them and violated the Constitution.

## II. Standard of Review

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As stated above, the factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff. *Shear v. National Rifle Ass'n of Am.*, 606 F.2d 1251, 1253 (D.C.Cir.1979).

## III. Analysis

### A. Draft Subchapter 1230 Is "Final Agency Action" Under The APA

Defendant argues that Plaintiffs' Complaint should be dismissed for lack of jurisdiction because there is no final agency action for this Court to review under the APA, 5 U.S.C. § 704. Defendant notes that Draft Subchapter 1230 has never been officially adopted or implemented, and therefore cannot be deemed "final" agency action.

Plaintiffs respond that, in actuality, Defendant has informally adopted and implemented Draft Subchapter 1230. They point out, for example, that USAREUR is

---

5. Certain categories of employees, such as those whose jobs require "frequent contact with officials of the host nation(s)" and family members of military employees, are exempted from limits on extensions of their tours of duty. Compl. Ex. E at 1230–6.

making personnel decisions based on the policies articulated in Draft Subchapter 1230 by reducing the number of civilian employees remaining overseas more than five years, by granting extensions only in increasingly rare circumstances, and by monitoring its progress in these areas to ensure that it meets its goals. Compl. Exs. G–I. For purposes of a motion to dismiss, these allegations must be taken as true. *Shear*, 606 F.2d at 1253.

■ It has now been three years since Defendant adopted its "Draft" Subchapter 1230. DOD has had ample time to revise and improve the document. No changes have been made to it in these three years, nor has DOD offered any evidence that it is actively considering any changes. Moreover, at oral argument on this Motion, defense counsel admitted that there are no plans to permanently adopt the "Draft" in the foreseeable future. Surely the mere semantic labeling of an agency policy as "draft" cannot serve to denote finality and, therefore, determine whether the federal courts have jurisdiction to review that policy. If that were the case, every federal agency could insulate its policies from judicial review by simply designating them as "draft" and never "finally" adopting them.

■ The purpose of withholding judicial review until an agency action is final

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Sea–Land Serv., Inc. v. Federal Maritime Comm'n*, 402 F.2d 631, 633 (D.C.Cir.1968) (Internal citation omitted).

■ Here, the agency has put the 1997 "draft" into effect, according to the allegations of the Complaint, and has had ample time—three years—to evaluate its operation "in a concrete way" and to make any necessary changes. It has no plans to either change the "draft" or to adopt it. Where there is no administrative process ongoing or planned that will terminate in a reviewable final order, an agency's "draft" decision may be reviewed as a final decision. *See Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 592 (D.C.Cir.1971). Under those circumstances, such a "draft" subchapter must be deemed "final" agency action for purposes of APA review.

### B. This Court Has Jurisdiction Under the APA Over Plaintiffs' Pre-Enforcement Challenge to the Defendant's Five Year Rule

The essence of Plaintiffs' Complaint, clothed in a number of different legal theories, is that the Five Year Rule, as embodied most currently in Draft Subchapter 1230, is contrary to law. In Count One of the Complaint, Plaintiffs allege that Draft Subchapter 1230 violates the APA for a number of reasons: it violates the merit principles of the Civil Service Reform Act ("CSRA");[6] it violates a number of other specified federal statutes including those prohibiting age discrimination; and, because it lacks a rational policy basis, it is "arbitrary and capricious".

■ In short, Plaintiffs are bringing the type of classic pre-enforcement challenge to the lawfulness of agency regulations, here Draft Subchapter 1230, which was recognized and sanctioned by our Court of

---

**6.** 5 U.S.C. § 2101 *et seq.*

Appeals in *National Treasury Employees Union v. Devine*, 577 F.Supp. 738, 745 (D.D.C.1983), *aff'd* 733 F.2d 114 (D.C.Cir. 1984).

Contrary to Defendant's vigorous arguments, Plaintiffs are *not* challenging individual reassignment and transfer decisions made by the agency. If they were, Defendant would easily prevail in light of the well-established principle that the comprehensive procedural framework of the CSRA is the exclusive means for resolution of any grievances, adverse actions, and unfair labor practices which it encompasses. *See Carducci v. Regan,* 714 F.2d 171, 175 (D.C.Cir.1983).

The words of *Devine,* 577 F.Supp. at 745, are exactly on point:

> Here however, the Court is not confronted with the sort of controversy falling neatly within the CSRA's scheme. This is not the typical sort of labor altercation between a federal employee and his federal employer. Nor is this an action alleging by way of a grievance, adverse action or unfair labor practice, that a federal agency has violated either a provision of a collective bargaining agreement or one of its own regulations, or that the agency has infringed on the collective bargaining rights of a union. *Rather, this is a traditional rule-making challenge brought under the APA by a party aggrieved by agency action,* 5 U.S.C. § 702, alleging that OPM's rules are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). (Emphasis added.)

Plaintiffs do not challenge any personnel decisions made in any individual cases, and in fact the Complaint contains no allegations about any specific transfer or reassignment. As Plaintiffs stated in their Opposition, "[t]here is no dispute between any employee and any supervisor and there is no remedy which could be sought under CSRA through a complaint filed with the Office of Special Counsel." Pl.'s Opp'n at 26.

■ For that reason, Defendant's lengthy arguments about the availability and exclusivity of review before the Merit Systems Protection Board and the Office of Special Counsel ("OSC") are unconvincing. The CSRA provides that the OSC is the proper forum in which to bring employee complaints about prohibited personnel actions, including improper reassignments, transfers, or "any other significant change in duties, responsibilities or working conditions." 5 U.S.C. § 2302(a)(2)(A)(xi). Congress has provided no judicial review in the CSRA for OSC's resolution of individual employee complaints. *Spagnola v. Mathis,* 859 F.2d 223, 225 (D.C.Cir.1988) (*en banc*).

Significantly, however, OSC lacks the power to invalidate any agency policy or action. *See* 5 U.S.C. § 1214. Thus, under Defendant's analysis, Plaintiffs are correct that there can be no judicial review of the across-the-board Five Year Rule embodied in "Draft" Subchapter 1230.

■ Such a conclusion would run counter to a long line of administrative law cases starting with *Abbott Labs. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) where the Supreme Court held that there is a basic presumption that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." That "strong presumption of reviewability . . . can be rebutted only by a clear showing that judicial review would be inappropriate." *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 807 (D.C.Cir.1983) (internal quotation marks and citations omitted).

Indeed, the Court of Appeals rejected precisely this argument in *Devine,* 733

F.2d at 117, n. 8, relying on *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 807 (D.C.Cir.1983), when it reasoned as follows:

> The appellant has also argued that this case cannot be brought under the Administrative Procedure Act because provisions in the Civil Service Reform Act of 1978 established the exclusive means to review the decisions at issue here. This claim is meritless. It is one thing to say that when a statute provides a detailed scheme of administrative protection for defined employment rights, less significant employment rights of the same sort are implicitly excluded and cannot form the basis for relief directly through the courts. It is quite different to suggest, as appellant does, that a detailed scheme of administrative adjudication impliedly precludes pre-enforcement judicial review of rules. (Internal citations omitted.)

■ In sum, "[p]reenforcement judicial review of final agency rules is appropriate under the APA," *National Treasury Employees Union v. Cornelius,* 617 F.Supp. 365, 366 (D.D.C.1985).

For all these reasons, the Court concludes that Plaintiffs' Complaint presents a traditional pre-enforcement facial challenge to a final agency rule—not a challenge to individual personnel decisions relating to transfers and reassignments. Therefore, the CSRA does not preclude the exercise of jurisdiction and judicial review under the APA, and Defendant's Motion To Dismiss is denied as to Plaintiffs' APA claim.

### C. Plaintiffs Have Not Sufficiently Pled Their Remaining Claims

### 1. Plaintiffs Have Not Stated A Claim For Breach of Contract

Plaintiffs allege that the United States breached its contract by limiting employees to only one extension under Draft Subchapter 1230. They claim that when they signed their rotation agreement, they did so under the belief that the 1981 version of the Rule would always apply and that they could therefore obtain an unlimited number of extensions so long as their performance was satisfactory. They also argue that the United States is obligated to act in good faith in its contracts with citizens and therefore should apply the 1981 version of the Rule.

Plaintiffs have failed to state a claim for breach of contract for several reasons.

■ First, federal employees hold their positions by virtue of federal personnel law and not under common law contract principles. Consequently, their employment relationships, terms and conditions are governed by Congressional statute and federal case law, rather than common law contract law. *See Bell v. United States,* 366 U.S. 393, 401, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961); *Kizas v. Webster,* 707 F.2d 524, 535 (D.C.Cir.1983); *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, 268 (1981).

■ Second, as our Court of Appeals has held in *Sharp v. Weinberger,* 798 F.2d 1521, 1523 (D.C.Cir.1986),

> [t]he sole remedy for an alleged breach of contract by the federal government is a claim for money damages, either in the United States Claims Court under the Tucker Act, or, if damages of no more than $10,000 are sought, in district court under the Little Tucker Act. The waiver of sovereign immunity in the Administrative Procedure Act does not run to actions seeking declaratory relief or specific performance in contract cases, because that waiver is by its terms inapplicable if "any other statute that grants consent to suit expressly or impliedly

forbids the relief which is sought," 5 U.S.C. § 702, and the Tucker Act and Little Tucker Act impliedly forbid such relief. (Internal citations and quotations omitted).

Thus, Plaintiffs have not properly stated a claim for breach of contract.

### 2. Plaintiffs Have Not Stated A Takings Claim

 Plaintiffs allege that Defendant's implementation of Draft Subchapter 1230 constitutes a government taking of private property without compensation because it denies Plaintiffs the opportunity to obtain extensions to remain overseas. As noted above, however, Plaintiffs do not allege that any individual Plaintiff has been denied an extension pursuant to Draft Subchapter 1230.[7] The Fifth Amendment to the Constitution provides that "private property [shall not] be taken for public use, without just compensation." Plaintiffs do not allege that they have lost anything to the Government, which is a threshold requirement for a takings claim. Therefore, Defendant's Motion To Dismiss is **granted** as to Plaintiffs' takings claim.

### 3. Plaintiffs Have Not Stated A Claim Under 10 U.S.C. § 1586

Plaintiffs allege that Draft Subchapter 1230 violates 10 U.S.C. § 1586, arguing that the statute prohibits Defendant from revoking their right to return. Plaintiffs have not, however, pointed to any occasion on which a named Plaintiff or other member of ODERAG was actually denied the right to return after attempting to exercise it. Therefore, Defendant's Mo-

tion To Dismiss is granted as to Plaintiffs' claims under 10 U.S.C. § 1586.[8]

## IV. Conclusion

For the foregoing reasons, Defendant's Motion To Dismiss is **denied** as to Plaintiffs' APA claim, and **granted** as to Plaintiffs' claim of breach of contract, their claim under the Fifth Amendment to the Constitution, and their claim under 10 U.S.C. § 1586.

---

7. The Court does not reach the question of whether the opportunity to obtain extensions constitutes property.

8. There is a question as to whether a private right of action exists under 10 U.S.C. § 1586, but because the Court grants Defendant's Motion To Dismiss on other grounds it need not reach that question.